**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| **KAREN CLINKSCALES** | _____ | : | **CIVIL ACTION** |
| | | : | |
| **v.** | | : | **NO. 06-3919** |
| | | : | |
| **THE CHILDREN'S HOSPITAL OF** | | : | |
| **PHILADELPHIA, <u>et al.</u>** | | : | |

<u>**MEMORANDUM AND ORDER**</u>

**Kauffman, J.**                                                                                     **May 6 , 2009**

Now before the Court is Defendants' Motion to Dismiss Plaintiff's Fourth Amended

Complaint (the "Motion").  For the reasons discussed below, the Motion will be granted in part

and denied in part.


**I.  BACKGROUND**

This case arises from the dismissal of Plaintiff Karen Clinkscales ("Plaintiff") as an

employee of the Children's Hospital of Philadelphia.  Accepting the allegations in the Fourth

Amended Complaint as true, the relevant facts are as follows:  In July 2003, Defendant

Children's Hospital of Philadelphia ("CHOP") hired Plaintiff as an Intellectual Property

Specialist.  Fourth Am. Compl. ¶ 10.  Plaintiff confirmed in writing with Defendants Denise

Outlaw ("Outlaw"), a human resources manager, and Kurt Schwinghammer

("Schwinghammer"), a hospital director, the job duties she was expected to perform.  <u>Id.</u> ¶ 11.

Schwinghammer advised Plaintiff that she would have the option of advancing to the position of

Licensing Associate or any other position within the department.  <u>Id.</u> ¶¶ 12-13.  Schwinghammer

-1-

also told her that as an Intellectual Property Specialist, she would be responsible for managing the day-to-day operations of the department, including management of the departmental budget, and that she "would essentially be his right hand." Id. ¶¶ 12-14. Based on the representations made by Outlaw and Schwinghammer, Plaintiff left her employment at Emory University and turned down another pending offer of employment. Id. ¶ 17. Plaintiff was the first and only African American employee hired to work full-time in her department. Id. ¶ 20.

Shortly after beginning work in September 2003, "it became apparent to Plaintiff that her responsibilities had changed significantly from how they were communicated by the Defendants during her interview process." Id. ¶ 21. She was not permitted "to perform her job responsibilities independently" and faced hostility from Schwinghammer whenever she attempted to perform the duties as she understood them. Id. ¶ 22. Schwinghammer would, inter alia, read every piece of correspondence addressed to her and "attempt to prevent Plaintiff from utilizing her own independent thought processes" either by directing her how to respond to the correspondence, or by responding to the correspondence without her knowledge. Id. ¶¶ 28-30. According to Plaintiff, Schwinghammer did not place similar restrictions on or demonstrate a similar level of hostility toward white coworkers. Id. ¶¶ 23, 26. After Plaintiff requested information necessary to prepare the departmental budget, Schwinghammer told her that he would handle the budget. Id. ¶ 47. Plaintiff later discovered that Schwinghammer reassigned the budget along with some of her other duties to a white coworker. Id. ¶ 50.

Plaintiff also alleges that Schwinghammer monitored her e-mails and phone calls but did not subject white employees to the same scrutiny. Id. ¶¶ 82-83. Schwinghammer excluded her from meetings that white coworkers were allowed to attend and copied a white coworker on

Plaintiff's e-mails in order to give others the impression that the coworker was responsible for Plaintiff's duties.  Id. ¶¶ 65-66.  Plaintiff further asserts that despite his earlier representations concerning the Licensing Associate position, Schwinghammer told her that she was not qualified to become a Licensing Associate but instead permitted a white employee with less education and experience to assume the duties of the position.  Id. ¶¶ 71, 75.  Schwinghammer also "required Plaintiff to meet standards for advancement opportunities that were higher than those of her white co-workers" and would humiliate her by sending her accusatory, hostile e-mails with copies to other coworkers.  Id. ¶¶ 84, 86.

In November 2003, Plaintiff complained of discriminatory treatment to Defendant Justina Green ("Green"), CHOP's Human Resources Director.  Id. ¶ 87.  Green suggested that Plaintiff apply for another position in the hospital.  Id. ¶ 89.  After Plaintiff made further complaints in 2004, Green told her that Schwinghammer's conduct was acceptable.  Id. ¶ 90.  Green at no time attempted to curtail Schwinghammer's behavior.  Id. ¶ 91.  In retaliation for her complaints to Green, Schwinghammer sent Plaintiff "an extremely hostile e-mail."  Id. ¶¶ 99-101.

On August 11, 2004, Defendant Nelcine Dudley ("Dudley"), a human resources employee, met with Plaintiff to discuss Schwinghammer's behavior.  Id. ¶ 107.  At this meeting, Plaintiff advised Dudley "that the hostile working environment created by Schwinghammer had become detrimental to her health and that she could no longer work in such an environment."  Id. ¶ 110.  Dudley arranged a meeting with Plaintiff and Schwinghammer to discuss "clarification of roles and responsibilities," but not to address Plaintiff's harassment claims.  Id. ¶ 118.  During this meeting, Schwinghammer remained hostile, asserted that Plaintiff performed poorly during her probation period, and gave her specific instructions on how to handle "Office Actions."  Id.

¶¶ 123, 128, 129.[1]

Approximately one week later, on August 18, 2004, Outlaw called Plaintiff into a meeting with Dudley and Schwinghammer.  Id. ¶¶ 135-136.  At this meeting, Schwinghammer again questioned Plaintiff's competence and stated that she did not handle the "Office Actions" as he had instructed at the previous meeting.  Id. ¶¶ 138-139.  Plaintiff advised Outlaw that she was working in a hostile environment which was keeping her from performing her duties.  Id. ¶ 148.  Outlaw stated that she would conduct an investigation of Plaintiff's disputes with Schwinghammer and hold a subsequent meeting, but no meeting was ever held.  Id. ¶¶ 154-155.  Neither Dudley nor Outlaw would agree to follow up with Plaintiff to discuss her concerns.  Id. ¶ 158.

On August 25, 2004, Schwinghammer sent Plaintiff a disciplinary "writeup" for her failure to follow his instructions, including his instructions on "Office Actions."  Id. ¶ 159.  Plaintiff refused to sign the document and explained that she wanted to speak with someone about the "writeup."  Id. ¶ 160.  When she was not contacted, Plaintiff called Green and explained that Schwinghammer had written her up in direct retaliation for her complaints of discriminatory treatment.  Id. ¶ 164.  Green declined to get involved and instructed Plaintiff to speak with Outlaw.  Id. ¶ 165.  Thereafter, Plaintiff spoke with Outlaw, who stated that she was aware of the writeup but took no further action.  Id. ¶¶ 167-169.

Due to her work environment, Plaintiff was advised by her doctor to take time off in order to recover from a stress-induced physical disability and related ailments.  Id. ¶ 174.  At no time

---

[1]     Office Actions are written communications from the United States Patent and Trademark Office ("USPTO") that provide details on the status of patent prosecution pending before the USPTO.  Fourth Am. Compl. ¶ 236.

during her medical leave did Schwinghammer "contact Plaintiff to see if he could assist her with her work." Id. ¶ 175.  In contrast, Schwinghammer contacted a white employee during that employee's medical leave and arranged to have her work completed during her absence, thus affording the white employee preferential treatment.  Id. ¶¶ 176-180.

Because the hostile working environment continued, Plaintiff took a second medical leave approximately one week after returning to work.  Id. ¶¶ 182-83.  She requested intermittent medical leave, "meaning that she would be able to take leave as the need would arise."  Id. ¶ 184. Two days after Plaintiff was out on intermittent medical leave, a consultant began taking over her job responsibilities.  Id. ¶ 185.  In October 2004, while on medical leave, Plaintiff again contacted human resources officials at CHOP about her discrimination complaints, and when they failed to investigate, she filed a complaint with the Pennsylvania Human Relations Commission ("PHRC").  Id. ¶¶ 189-193.  A copy of the complaint was also filed with the United States Equal Employment Opportunity Commission.  Id. ¶ 193.

While Plaintiff was out on medical leave, she received a letter from CHOP notifying her that if she did not return to work in December 2004, she would be placed on layoff status.  Id. ¶ 197.  She replied in writing, advising CHOP that her doctors considered her medically disabled and unable to work, but that she looked forward to returning when able to do so.  Id. ¶ 198. Plaintiff explains that this letter to CHOP was a request for CHOP to accommodate her disability.  Id. ¶ 199.  Instead of accommodating Plaintiff, CHOP sent her a letter in January 2005 stating that it would seek to replace her and that if it were able to fill her position, her

employment would be terminated. Id. ¶¶ 208-209.[2]  Plaintiff claims that at the time this letter

was sent, Schwinghammer already had replaced her with a consultant. Id. ¶¶ 207, 210.

After receiving the January 2005 letter, Plaintiff's medical condition worsened and she

was unable to return to work. Id. ¶ 216.  She asserts that CHOP has a policy that affords all

employees the opportunity to relocate to another department if his or her position is filled while

he or she is out on medical leave and that CHOP refused to afford her this opportunity. Id. ¶ 211.

Plaintiff asserts that CHOP terminated her employment in direct retaliation for her filing of a

complaint with the PHRC. Id. ¶¶ 219-220.

Plaintiff filed her Complaint in this Court on September 1, 2006, an Amended Complaint

on September 29, 2006, and a Second Amended Complaint on January 12, 2007.  The Second

Amended Complaint contained a total of 13 counts:[3] racial discrimination in violation of Title

VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (Count I); hostile work

environment in violation of Title VII (Count II); intentional racial discrimination in violation of

42 U.S.C. § 1981 (Count III); retaliation in violation of Title VII (Count IV); disability

discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101

et seq. (Count V); racial discrimination in violation of the Pennsylvania Human Relations Act

("PHRA"), 43 Pa. Cons. Stat. §§ 955 et seq. (Count VI); retaliation in violation of the PHRA

(Count VII); aiding and abetting against Green, Dudley, Outlaw, and CHOP in violation of the

PHRA (Count VIII); a state law fraud claim against CHOP, Outlaw, and Schwinghammer (Count

---

[2]       Plaintiff also claims that CHOP sent her a letter in January 2005 "confirming the fact that CHOP was aware that Plaintiff had a verifiable disability."  Fourth Am. Compl. ¶ 200.

[3]       Unless otherwise noted, the claims in each of the 13 counts were asserted against all Defendants.

IX); a breach of contract claim against CHOP, Outlaw, and Schwinghammer (Count X); a negligent misrepresentation claim against CHOP, Outlaw, and Schwinghammer (Count XI); a state law personal injury claim (Count XII); and disability discrimination in violation of the PHRA (Count XIII).

On November 9, 2007, the Court issued a Memorandum and Order dismissing Counts I, II, IV, V, VI, and XIII with respect to Defendants Schwinghammer, Green, Dudley, and Outlaw. Clinkscales v. Children's Hosp. of Phila., 2007 U.S. Dist. LEXIS 83930 (E.D. Pa. Nov. 9, 2007). The Court also dismissed Counts IX and XI in their entirety and Count XII with respect to Defendant CHOP. The Court permitted Plaintiff twenty days in which to amend her pleading in order to clarify allegations against Defendants Green, Dudley, and Outlaw and to plead additional facts in support of Count X. Thereafter, Plaintiff filed a Third Amended Complaint consistent with the Court's instructions, as well as a Motion to File a Fourth Amended Complaint adding additional counts. Because Defendants did not oppose the filing of a Fourth Amended Complaint, the Court granted Plaintiff's Motion, and the Fourth Amended Complaint was filed on April 11, 2008.[4]

The Fourth Amended Complaint contains the surviving claims from her Second

---

[4] Plaintiff's Fourth Amended Complaint appears to reassert the counts dismissed by the Court in its Memorandum and Order of November 9, 2007. However, in her Response to the Motion, she clarifies that she "is not seeking to reassert the counts/claims that this Court previously dismissed. Rather, she was just unaware that she needed to remove them from her amended complaint." Pl.'s Resp. 6. For the sake of clarity, the Order accompanying this Memorandum will again dismiss all counts previously dismissed from Plaintiff's Second Amended Complaint.

Amended Complaint as well as eight additional claims:[5] a claim for hostile work environment in violation of 42 U.S.C. § 1981 (Count XIV); "retaliatory harassment" in violation of 42 U.S.C. § 1981 (Count XV); retaliation in violation of 42 U.S.C. § 1981 (Count XVI); "retaliatory harassment" in violation of Title VII (Count XVII); hostile work environment in violation of the PHRA (Count XVIII); a retaliation claim in violation of the ADA against CHOP (Count XIX); a retaliation claim in violation of the PHRA against CHOP (Count XX); and "retaliatory harassment" in violation of the PHRA (Count XXI).

## II. LEGAL STANDARD

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court is required "to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989). In deciding a 12(b)(6) motion, "a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record." Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994). "To survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" Victaulic Co. v. Tieman, 499 F.3d 227, 234 (3d Cir. 2007) (citations omitted in original) (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)). Because Plaintiff is appearing pro se, the Court will construe her

---

[5]     The following counts are asserted against all Defendants except where otherwise noted.

Fourth Amended Complaint liberally and hold it "to less stringent standards than formal

pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972).


## III.  ANALYSIS

### A.  Plaintiff's Amended Claims (Counts III, VII, X, and XII)

As required by the Court's Memorandum and Order dated November 9, 2007, Plaintiff

has provided additional allegations in support of her 42 U.S.C. § 1981 intentional racial

discrimination claim against Green, Dudley, and Outlaw (Count III); her PHRA retaliation claim

against Green, Dudley, and Outlaw (Count VII); and her breach of contract claim against CHOP,

Outlaw, and Schwinghammer (Count X).  Although Plaintiff was given leave to amend her

personal injury claim against Green, Dudley, and Outlaw (Count XII), she has instead withdrawn

that claim.  See Pl.'s Resp. 15 ("Plaintiff does not re-assert count twelve (personal injury).").

Accordingly, the Court will dismiss Count XII.[6]

### 1.  Count III (Intentional Race Discrimination)

As explained in the Court's previous Memorandum and Order, individuals may be held

liable under 42 U.S.C. § 1981 if they are involved personally in acts of discrimination.  See, e.g.,

Al-Khazraji v. St. Francis Coll., 784 F.2d 505, 518 (3d Cir. 1986).  In response to Defendants'

Motion to Dismiss the Second Amended Complaint, Plaintiff requested and received leave to

amend her pleading.

---

[6]      The Court's November 9, 2007 Memorandum and Order dismissed Count XII
with respect to CHOP.  Although the Court declined to dismiss Count XII with respect to
Schwinghammer, Green, Dudley, and Outlaw, Plaintiff's withdrawal of the claim renders
dismissal appropriate as to all Defendants.

In her Fourth Amended Complaint, however, Plaintiff merely recites a list of vague, conclusory allegations against these Defendants.  For example, she alleges that "Green engaged in discriminatory practices when she assisted and/or directed, and/or participated, and/or authorized Schwinghammer's efforts to create a hostile work environment by issuing Plaintiff a disciplinary write-up in retaliation for her complaints of discriminatory treatment."  Fourth Am. Compl. ¶ 232.  She asserts further that "Green engaged in discriminatory practices when she assisted and/or directed, and/or authorized, and/or participated in the creation of or decision to send a letter to Plaintiff in January of 2005 which effectively terminated Plaintiff's employment." Id. ¶ 233.  Her allegations are no clearer with respect to Dudley and Outlaw.  See id. ¶¶ 222-227 (alleging that Dudley "assisted and/or directed, and/or authorized, and/or participated in" Schwinghammer's discriminatory actions and Plaintiff's termination); id. ¶¶ 229-231 (alleging that Outlaw "assisted and/or directed, and/or authorized, and/or participated in" Schwinghammer's misconduct as well as Plaintiff's firing).  Notably absent from these allegations are actual facts describing how any of these Defendants assisted, directed, participated in, or authorized the discriminatory conduct.

As the Third Circuit has explained, the Court "need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss."  Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997); see also Frederick v. Se. Pa. Transp. Auth., 892 F. Supp. 122, 125 (E.D. Pa. 1995) (explaining that a plaintiff bringing a § 1981 claim may not rely on vague, conclusory allegations because "[a] specific factual basis must be pled to create the inference of discrimination").  Accordingly, Plaintiff's vague assertions that Green, Dudley, and Outlaw personally engaged in discriminatory conduct through unspecified means (i.e., by

-10-

assisting, directing, authorizing, and/or participating in the conduct of other actors) are

insufficient to withstand Defendants' Motion.  The only fact-based allegations relevant to any

possible discrimination claim are that Green, Dudley, and Outlaw were aware of

Schwinghammer's conduct but failed to resolve the issue.[7]  Plaintiff's Fourth Amended

Complaint details extensively the various allegedly discriminatory acts undertaken by

Schwinghammer and CHOP, but nothing in the Fourth Amended Complaint affirmatively links

Green, Dudley, or Outlaw to that misconduct.  See, e.g., Johnson v. Res. for Human Dev., 843 F.

Supp. 974, 978 (E.D. Pa. 1994) ("[A] claim seeking to impose personal liability under Section

1981 must be predicated on the actor's personal involvement and there must therefore be some

affirmative link to causally connect the actor with the discriminatory action." (citing Allen v.

Denver Pub. Sch. Bd., 928 F.2d 978, 983 (10th Cir. 1991))).  Because Plaintiff was given the

opportunity to amend her pleading to add facts that would support a 1981 claim against Green,

Dudley, and Outlaw, her failure to do so requires dismissal of Count III with respect to these

Defendants.[8]

_____

[7]      To the extent Plaintiff seeks to impose liability on Green, Dudley, and Outlaw for
failing to prevent the discrimination of others despite their ability to do so, her aiding and
abetting PHRA claim in Count VIII covers this form of liability.  See Davis v. Levy, Angstreich,
Finney, Baldante, Rubenstein & Coren, P.C., 20 F. Supp. 2d 885, 887 (E.D. Pa. 1998) ("[A]n
individual supervisory employee can be held liable under an aiding and abetting/accomplice
liability theory pursuant to [the PHRA] for . . . failure to take action to prevent further
discrimination by an employee under supervision.").

[8]      Because the Court agrees that Plaintiff's confusing, conclusory allegations attempt
to hold all Defendants in this case individually responsible for the alleged harm she suffered, the
Court will grant Defendants' request to strike paragraphs 222-235 and 249-250 from the Fourth
Amended Complaint.  As one court has explained, "[t]he purpose of a motion to strike is to clean
up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters."
McInerney v. Moyer Lumber & Hardware, Inc., 244 F. Supp. 393, 402 (E.D. Pa. 2002).
While motions to strike are not granted liberally, the Court concludes that the vague allegations

## 2. Count VII (PHRA Retaliation)

As explained in the Court's previous Memorandum and Order, individuals may be held personally liable for acts of retaliation.  See 43 Pa. Cons. Stat. § 955(d) (explaining that "any person" may be liable for retaliation); Wein v. Sun Co., 936 F. Supp. 282, 283 (E.D. Pa. 1996) ("[U]nder the plain meaning of the language of [PHRA section 955(d)] . . . an individual . . . may be held personally accountable for retaliatory discrimination as well.").  As with Count III, Plaintiff asked for and received permission to amend her pleadings to detail specifically how Green, Dudley, and Outlaw retaliated against her.  However, Plaintiff's allegations against these Defendants fare no better than did her allegations with regard to her intentional race discrimination claim, supra.  As above, Plaintiff asserts boilerplate allegations that Green, Dudley, and Outlaw assisted, directed, authorized, and/or participated in Schwinghammer and CHOP's allegedly retaliatory conduct, but the only fact-based allegations against these Defendants are that they "took sides" with Schwinghammer and did not act in response to Plaintiff's complaints.  See, e.g., Fourth Am. Compl. ¶¶ 89-90 (alleging that Green found Schwinghammer's behavior acceptable and that she suggested Plaintiff work elsewhere in the hospital); id. ¶ 144 (alleging that Dudley falsely stated that she believed Schwinghammer's version of events); id. ¶ 152 (alleging that Outlaw attempted to blame Plaintiff for Schwinghammer's conduct and accused her of "taking the victim stance").  In cases where an employee complains of discriminatory conduct, however, "some strain on workplace relationships is inevitable.  Sides will be chosen, lines will be drawn, and those who were once

_____

contained in these paragraphs add unnecessary confusion to an already lengthy pleading.  See DeLa Cruz v. Piccari Press, 521 F. Supp. 2d 424, 428 (E.D. Pa. 2007) (explaining that a motion to strike may be granted where the allegations confuse the remaining issues in the case).

the whistleblower's friends may not be so friendly anymore.  But what the statute proscribes is retaliation, not loyalty to an accused coworker or a desire to avoid entanglement in workplace controversy."  Jensen v. Potter, 435 F.3d 444, 452 (3d Cir. 2006) (internal citations omitted), overruled in part on other grounds by Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53 (2006).[9]  Therefore, Plaintiff's allegations that Green, Dudley, and Outlaw wrongly took Schwinghammer's side, as well as her boilerplate allegations that they assisted, directed, authorized, and/or participated in Schwinghammer and CHOP's allegedly retaliatory conduct, are insufficient to survive the instant Motion.  Accordingly, Count VII will be dismissed as to Green, Dudley, and Outlaw.

### 3.  Count X (Breach of Contract)

Pursuant to Pennsylvania law, employment is considered at-will, and as such, "it is presumed that either party may end an employment relationship at any time, for any or no cause." Murray v. Commercial Union Ins. Co., 782 F.2d 432, 435 (3d Cir. 1986).[10]  "In order for the presumption of employment-at-will to be overcome, there must be either an express contract between the parties, or an implied in-fact contract plus additional consideration passing from the employee to the employer from which the court can infer the parties intended to overcome the at-will presumption."  Raines v. Haverford Coll., 849 F. Supp. 1009, 1012 (E.D. Pa. 1994)

---

[9]     Although the Third Circuit in Jensen was discussing retaliation under Title VII, the analysis applies with equal force to a retaliation claim under the PHRA because that statute is construed in accordance with Title VII.  See Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

[10]     Of course, at-will employment does not insulate an employer from liability if it terminates an employee for discriminatory reasons, and the majority of Plaintiff's claims are based on the theory that the reasons for her termination were discriminatory.

(citing <u>Ruzicki v. Catholic Cemeteries Ass'n</u>, 610 A.2d 495, 497 (Pa. Super. Ct. 1992)).  "[A] court will find 'additional consideration' when an employee affords his employer a substantial benefit other than the services which the employee is hired to perform, or when the employee undergoes a substantial hardship other than the services which he is hired to perform."
<u>Darlington v. Gen. Elec.</u>, 504 A.2d 306, 315 (Pa. Super. Ct. 1986).

Plaintiff alleges that although she was not hired pursuant to a written employment contract, an implied contract was created when she provided additional consideration to CHOP. In support of her claim that she provided additional consideration, Plaintiff alleges (a) that she possessed a business degree even though her position did not require it, and (b) that although she was hired only as an Intellectual Property Specialist, she agreed to take on additional responsibilities related to marketing and licensing technologies.  <u>See</u> Fourth Am. Compl. ¶¶ 238, 242, 245.  Therefore, she argues, she conferred additional benefits on CHOP by providing "her MBA skills" and "her ability to assist . . . with marketing and licensing of technologies" that an ordinary employee in her position would not have provided.  <u>Id.</u> ¶ 245.  However, Plaintiff's Fourth Amended Complaint explains that as a result of her additional education and desire to assume additional responsibilities, she was able to negotiate a salary approximately $10,000 per year higher than the salary normally offered to an Intellectual Property Specialist.  <u>Id.</u> ¶¶ 238-240. Plaintiff's salary, therefore, accounted for her additional skills and duties, and by agreeing to accept the increased salary (and corresponding additional duties), she did not provide her "employer [with] a substantial benefit other than the services which the employee is hired to perform."  <u>Darlington</u>, 504 A.2d at 315.

Moreover, even if the Court were to find that an implied contract between Plaintiff and

-14-

CHOP existed, any such contract would protect against dismissal only for a "reasonable" period of time.  See, e.g., Zysk v. FFE Minerals USA, Inc., 225 F. Supp. 2d 482, 502 (E.D. Pa. 2001) (recognizing that additional consideration can create "an implied contract for a reasonable period of employment"); Buckwalter v. ICI Explosives USA, Inc., 1998 U.S. Dist. LEXIS 276, at *29 (E.D. Pa. Jan. 8, 1998) ("Even if an employee provides additional consideration, an employee is only afforded job security for a reasonable amount of time."); Veno v. Meredith, 515 A.2d 571, 580 (Pa. Super. Ct. 1986) ("When sufficient additional consideration is present, an employee should not be subject to discharge without just cause for a reasonable time.").  In the instant case, Plaintiff remained an employee of CHOP from September 2, 2003 until December 2004, a total of approximately fifteen months.  Plaintiff cites no case in which a court has found employment for this length of time to be unreasonable.[11]  Thus, even if the parties created an implied contract, CHOP honored that implied contract by employing her for approximately fifteen months.  See Zysk, 225 F. Supp. 2d at 502 ("Even if we assume arguendo . . . that [Plaintiff's] case is one of those 'rare instances' in which an implied in-fact contract for a reasonable period of time was created, we hold as a matter of law that his two-plus years of employment with Defendant more than fulfilled the required 'reasonable period.'").[12]  The Court rejects the argument that CHOP

---

[11]     Indeed, in the few cases where courts have found an implied employment contract, the employees in question were terminated after extremely brief periods of employment. See News Printing Co. v. Roundy, 597 A.2d 662, 665 (Pa. Super. Ct. 1991) (three months); Cashdollar v. Mercy Hosp. of Pittsburgh, 595 A.2d 70, 73-74 (Pa. Super. Ct. 1991) (sixteen days); Scullion v. Emeco Indus., Inc., 580 A.2d 1356, 1359 (Pa. Super. Ct. 1990) (three months); Lucacher v. Kerson, 45 A.2d 245, 247 (Pa. Super. Ct. 1946) (four days).

[12]     As one court has explained, "[t]he length of time during which it would be unreasonable to terminate, without just cause, an employee who has given additional consideration should be commensurate with the hardship the employee has endured or the benefit he has bestowed." Veno, 515 A.2d at 580.  Given Plaintiff's allegations that she moved to

was required to employ Plaintiff for any longer than this "reasonable" period.  See id. ("Our courts would never imply a contract requiring an employer to continue paying an employee for years when his services were no longer useful.").  Accordingly, Count X will be dismissed in its entirety.[13]

### B.  Plaintiff's Additional Claims (Counts XIV-XXI)

#### 1.  Counts XIV and XVIII (Hostile Work Environment)

In addition to her existing hostile work environment claim under Title VII (Count II), Plaintiff now brings a hostile work environment claim under the PHRA and 42 U.S.C. § 1981. To establish a prima facie case of a hostile work environment under 42 U.S.C. § 1981 or the PHRA, a plaintiff must show: (1) that she suffered intentional discrimination because of her membership in a protected class; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would have detrimentally affected a reasonable person in the same position; and (5) the existence of respondeat superior liability.  See, e.g., West v. Phila. Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995) (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)).[14]  As discussed in the Court's

---

Philadelphia and gave up other employment opportunities—detriments that are "commensurate with those incurred by all manner of salaried professionals," id.—the Court finds that fifteen months of employment exceeds any "reasonable" period of employment based on the hardships she alleges.

[13]     Plaintiff brings the breach of contract claim against CHOP, Schwinghammer, and Outlaw.  However, Plaintiff alleges only that she had an implied contract with CHOP and that CHOP violated this contract.  Fourth Am. Compl. ¶¶ 238-245.  Accordingly, because Plaintiff fails to allege any contract existing between herself and Schwinghammer or Outlaw, the claims against these Defendants will be dismissed.

[14]     The elements of a hostile work environment claim under 42 U.S.C. § 1981 and the PHRA are the same as under Title VII.  See, e.g., Woodard v. PHB Die Casting, 255 F. App'x

previous Memorandum and Order, Plaintiff claims, inter alia, that despite written confirmation of her job duties, those duties were reassigned to white employees; that she was held to higher standards of conduct than white employees; that she was humiliated by Schwinghammer in emails copied to a fellow employee; that Schwinghammer monitored her phone calls and e-mails but did not monitor the communications of white employees; that Schwinghammer disciplined her in writing for complaining about the hostile work environment; that a white employee was given preferential treatment when that employee took medical leave; and that CHOP and human resources officials were aware of the alleged hostile working environment but failed to remedy the problem.  Because the Court previously concluded that Plaintiff successfully pled a hostile work environment claim against CHOP pursuant to Title VII, the Court finds that her Section 1981 and PHRA claims against CHOP for a hostile work environment also meet the requirements of Federal Rule of Civil Procedure 8.

With respect to the individual Defendants, the Court finds that Plaintiff's Section 1981 claim against Schwinghammer also survives the instant Motion.  The overwhelming majority of discriminatory incidents Plaintiff allegedly experienced were a result of Schwinghammer's conduct, and when viewed in the totality of the circumstances, see Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001), the Court finds that Plaintiff has pled a viable Section 1981 claim against him.  However, for the reasons discussed above in Section III.A.1, supra, Plaintiff has not alleged sufficient conduct to hold Green, Dudley, and Outlaw personally liable under Section 1981.  Further, under the PHRA, individuals may not be held personally liable for

---

608, 609 (3d Cir. 2007) (PHRA claims); Ocasio v. Lehigh Valley Family Health Ctr., 92 F. App'x 876, 879 (3d Cir. 2004) (Section 1981 claims).

discrimination.  See Dici v. Pennsylvania, 91 F.3d 542, 552 (3d Cir. 1996) (holding that 43 Pa.

Cons. Stat. § 955(a) does not provide for individual liability).[15]  Accordingly, the Section 1981

claims against Green, Dudley, and Outlaw will be dismissed, and the PHRA claim against all

individual Defendants will be dismissed.

### 2.  Counts XV, XVII, and XXI (Retaliatory Harassment)

In addition to her retaliation claims based on Schwinghammer's disciplinary "writeup"

and CHOP's termination of her employment (Counts IV and VII), Plaintiff now brings a

retaliation claim predicated on harassing conduct aside from the aforementioned adverse

employment actions.  As the Third Circuit has explained, a plaintiff bringing a retaliation claim

based on harassing conduct "must show that a reasonable employee would have found the

alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination.'"  Moore v. City of

Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006) (quoting Burlington, 548 U.S. at 68).[16]  CHOP

---

[15]     As explained in the Court's prior Memorandum and Order, individual supervisory
employees may be held liable under an aiding and abetting theory under 43 Pa. Cons. Stat. §
955(e) for failure to prevent discriminatory conduct.  See Dici, 91 F.3d at 552-53.  Thus,
Plaintiff's existing aiding and abetting claim against Green, Dudley, and Outlaw addresses their
alleged failure to end the ongoing discrimination.  With respect to Schwinghammer, courts in this
district are divided on whether a supervisory employee may be held liable under an aiding and
abetting theory for his or her own direct acts of discrimination.  Compare Stepp v. Fairpoint
Commc'ns, Inc., 2007 U.S. Dist. LEXIS 88302, at *23-24 (W.D. Pa. Nov. 30, 2007) ("The law is
clear that direct incidents of discrimination or harassment by a supervisor are not covered by the
terms of Section 955(e)." (citing Dici, 91 F.3d at 553)), with Davis, 20 F. Supp. 2d at 887  ("[A]n
individual supervisory employee can be held liable under an aiding and abetting theory pursuant
to § 955(e) for his own direct acts of discrimination . . . .").  Because Plaintiff has not attempted
to bring an aiding and abetting claim against Schwinghammer, the Court need not reach this
issue.

[16]     The Third Circuit's discussion of retaliatory harassment in Moore dealt
exclusively with claims arising under Title VII.  However, because the PHRA and 42 U.S.C. §

can be held liable for the retaliatory harassment of Schwinghammer, Plaintiff's immediate supervisor. See Jensen, 435 F.3d at 452 ("Under Title VII, much turns on whether the harassers are supervisors or coworkers. If supervisors create the hostile environment, the employer is strictly liable, though an affirmative defense may be available where there is no tangible employment action."). Throughout her Fourth Amended Complaint, Plaintiff alleges instances of Schwinghammer's retaliatory conduct that, if proven, would constitute harassment. For example, she alleges that he sent her hostile, threatening e-mails after she complained to Green about his behavior, see Fourth Am. Compl. ¶¶ 99-101; that he angrily called her incompetent, threw paperwork, and stated he was "keeping a file" on her at the meeting with Dudley and Outlaw, id. ¶¶ 137-139; and that, in retaliation for her discrimination complaints, he assigned her additional work while she was on medical leave in order to "make it appear that Plaintiff was just not performing her duties," id. ¶ 248. When viewed in total, Schwinghammer's alleged conduct "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination," Burlington, 548 U.S. at 68, and accordingly, Plaintiff's claim against CHOP will be permitted to proceed.

However, as the Court noted throughout its previous Memorandum and Order, individuals may not be held liable under Title VII. See, e.g., Sheridan v. E.I. Dupont de Nemours & Co., 100 F.3d 1061, 1078 (3d Cir. 1996). Accordingly, Count XVII will be dismissed as to all individual Defendants.[17] Under 42 U.S.C. § 1981 and the PHRA, individuals may be held liable

_____

1981 are analyzed in the same manner as Title VII, the Court will consider the retaliatory harassment claim under all three statutes together.

[17]    Plaintiff agrees with the dismissal of the individual Defendants. See Pl.'s Resp. 6 (explaining that despite the plural "Defendants" used in the Fourth Amended Complaint, she

for retaliation, see, e.g., Cardenas v. Massey, 269 F.3d 251, 268 (3d Cir. 2001); Wein, 936 F.

Supp. at 283, and based on the allegations discussed above, the Court concludes that Plaintiff's

claims against Schwinghammer survive the instant Motion.  However, because the allegations

against Green, Dudley, and Outlaw amount to nothing more than the "normally petty slights,

minor annoyances, and simple lack of good manners" that all employees face in the workplace,

Burlington, 548 U.S. at 68, the individual claims against them will be dismissed.

### 3.  Counts XIX and XX (Retaliation Under the ADA and PHRA)

In her Fourth Amended Complaint, Plaintiff brings a retaliation claim under the ADA

against CHOP on the theory that once she engaged in protected activity by seeking an

accommodation, she was terminated without the opportunity to return to another position.  See

Fourth Am. Compl. ¶ 247.  Plaintiff's Fourth Amended Complaint also brings a retaliation claim

under the PHRA against CHOP for her discharge and denial of alternative employment

opportunities after she requested an accommodation.[18]

With respect to both the ADA and the PHRA claim, Defendants argue that Plaintiff's

allegations fail to provide them "fair notice" of the basis for her disability discrimination

claims.[19]  As explained in its previous Memorandum and Order, Plaintiff alleges that she had a

---

does not intend to assert Count XVII against the individual Defendants).

[18]    Plaintiff confusingly entitles this Count "Violation of the PHRA ADA Retaliation," and Plaintiff herself "is unsure as to whether or not she can assert a specific claim for ADA Retaliation under the PHRA."  Pl.'s Resp. 18.  Reading this Count liberally, the Court construes this claim as arising under the PHRA for disability-based retaliation, making it a state-law counterpart to the ADA claim for disability-based retaliation in Count XIX.

[19]    Defendants also ask the Court to reconsider its previous decision to allow Plaintiff's original disability discrimination claims to proceed.  The purpose of a motion for reconsideration "is to correct manifest errors of law or to present newly discovered evidence."

disability brought on by stress at work, see Fourth Am. Compl. ¶¶ 174, 194; that Defendants

acknowledged this disability in writing, see id. ¶ 200; that she requested a period of intermittent

medical leave, "meaning that she would be able to take leave as the need would arise," to

accommodate her disability, id. ¶ 184; and that rather than discuss possible accommodations,

CHOP terminated her employment in violation of its own medical leave policy, see id. ¶¶ 201-

202, 211.  Although Defendants are correct that Plaintiff does not name her disability

specifically, it is beyond dispute that the anxiety and stress of which she complains are covered

by the ADA.  See 29 C.F.R. § 1630.2(h)(2) (providing that under the ADA, a "mental

impairment" includes "emotional or mental illness"); Maslanka v. Johnson & Johnson, Inc., 2008

U.S. Dist. LEXIS 27132, at *35 (D.N.J. Mar. 31, 2008) ("ADA regulations make clear that

anxiety and depression are impairments under the ADA."); Norman v. Univ. of Pittsburgh, 2002

U.S. Dist. LEXIS 27694, at *14 n.2 (W.D. Pa. Sept. 17, 2002) ("Mental conditions such as panic

and anxiety disorders, depression and agoraphobia—when they occur on a chronic, non-transient

basis—have been recognized by the Third Circuit as disabilities for purposes of the ADA and

---

Max's Seafood Cafe v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999) (quoting Harsco Corp. v.
Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985)).  Mere disagreement with the Court's previous
ruling, however, is an improper basis for Defendants' request because "[a] motion for
reconsideration is not properly grounded on a request that the Court simply rethink a decision it
has already made."  Douris v. Schweiker, 229 F. Supp. 2d 391, 408 (E.D. Pa. 2002) (quoting
Glendon Energy Co. v. Borough of Glendon, 836 F. Supp. 1109, 1122 (E.D. Pa. 1993)).
Moreover, a motion for reconsideration under Fed. R. Civ. P. 60(b) must be made "within a
reasonable time," and Defendants have not explained why they raise these arguments
approximately six months after the Court's original decision.  In any event, because the Court is
required to consider the sufficiency of Plaintiff's disability claims in Counts XIX and XX, the
Court also will consider Defendants' arguments as they apply to her other disability
discrimination claims.

PHRA." (listing cases)).[20]  Whether or not Plaintiff will be able to prove that her stress condition is a "disability" under the ADA, at this stage of the proceedings, Plaintiff's pro se pleading adequately sets forth the basis of her claims.

Defendants also argue that Plaintiff's request for medical leave was for an indefinite period of time and therefore could not be a request for a reasonable accommodation under the ADA.  Under the ADA, a reasonable accommodation can include restructuring work duties or modifying an employee's work schedule to permit the employee to continue working with his or her disability.  29 C.F.R. § 1630.2(o)(2)(ii).  While Defendants are correct that a request to stay home from work indefinitely is not a reasonable accommodation, "there are situations in which extended leave is allowed under the ADA, such as where the leave will enable an employee to perform the essential functions of the job in the near future."  Hines v. Twp. of Harrison, 2007 U.S. Dist. LEXIS 72822, at *6 (W.D. Pa. Sept. 28, 2007) (citing Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 151 (3d Cir. 2004)).  Plaintiff allegedly informed CHOP in December 2004 that "she was still considered medically disabled by her doctors and was not yet ready to return to work but looked forward to returning when she was medically able to do so."  Fourth Am. Compl. ¶ 198.  Viewing this allegation in the light most favorable to Plaintiff, the Court cannot find that her leave request was so open-ended as to constitute a request for indefinite leave.  Plaintiff has alleged that she requested intermittent leave, meaning that she would take leave "for a day or a few days" if the need arose.  Id. ¶ 184.  At this stage in the proceedings, the Court cannot find that a request for, at most, several days of leave at a time is per se unreasonable

---

[20]     Likewise, at the motion to dismiss stage, it is of no consequence that Plaintiff has not named the specific major life activity affected by her alleged disability.  See, e.g., Grant v. Allegheny Ludlum Corp., 2007 U.S. Dist. LEXIS 64348, at *17-18 (W.D. Pa. Aug. 30, 2007).

under the ADA.[21]  Accordingly, the Court will not dismiss Counts XIX and XX with respect to CHOP.


## IV.  CONCLUSION

For the reasons discussed above, the Motion will be granted in part and denied in part. An appropriate Order follows.

---

[21]     Numerous courts have recognized that requests for indefinite or extended leave when an employee's prognosis is uncertain are not "reasonable" accommodations under the ADA.  See, e.g., Hudson v. MCI Telecomms. Corp., 87 F.3d 1167, 1169 (10th Cir. 1996); Myers v. Hose, 50 F.3d 278, 283 (4th Cir. 1995).  However, at the motion to dismiss stage, the Court cannot determine the certainty of Plaintiff's prognosis or whether her request was, as Defendant argues, to stop coming to work for an indefinite period.  Plaintiff has alleged that she requested leave of limited duration, and this allegation is sufficient to survive the instant Motion.